IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**STEVEN D. WISE,**                                    Case No. 1:16 CV 817

     Plaintiff,                                      Judge Donald C. Nugent

     v.                                              Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                                      REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Steven D. Wise ("Plaintiff") filed a complaint against the Commissioner of Social

Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny

disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The

district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred

to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-

document entry dated April 6, 2016). Following review, the undersigned recommends the Court

affirm the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed an application for benefits in June 2012, alleging disability as of December

1, 2010. (Tr. 192, 200). The claims were denied initially (Tr. 126, 130) and on reconsideration (Tr.

139, 146). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at an

administrative hearing on July 1, 2014. (Tr. 32-60). Following the hearing, an administrative law

judge ("ALJ") issued an unfavorable decision finding Plaintiff not disabled. (Tr. 12-30). The

Appeals Council denied Plaintiff's request for review, making the hearing decision the final

decision of the Commissioner. (Tr. 1-5); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff filed the instant action on April 6, 2016. (Doc. 1).

### FACTUAL BACKGROUND

Personal and Vocational Background

Plaintiff was born on September 6, 1965, and was 45 years old on the alleged date of disability. (Tr. 64). He has a 12th grade education (Tr. 232) and less than one year of college (Tr. 52-53, 57-58). He has past relevant work as a census worker and security guard. (Tr. 23, 54, 232, 286).

Relevant Evidence[1]

A May 2012 treatment note states: "Takes Sertraline. 'low point' recently, not specific[]" and adds that Plaintiff had been treated at an "outside facility for depression." (Tr. 305). Plaintiff was assessed with depression, prescribed Sertraline, and referred to psychiatry. (Tr. 307).

A disability report dated June 12, 2012, noted Plaintiff was polite, cooperative, well spoken, neatly dressed, and well groomed, but had poor eye contact. (Tr. 228). Later that month, Plaintiff completed a function report. (Tr. 241). He stated he had difficulty with his thoughts and being around others. *Id*. Plaintiff also reported "feeling down all the time", hearing voices, and experiencing back pain. *Id.* He noted his daily activities included trying to watch television, but sitting too long caused him back pain. (Tr. 242). He needed reminders to take care of personal needs and grooming, and to take his medicine. (Tr. 242-43). Plaintiff stated he prepared his own meals weekly and reported no changes in cooking habits, but also added others would help get him

---

1. Plaintiff challenges only the ALJ's analysis of Dr. Michelle Romero's opinion regarding Plaintiff's mental impairments; as such, all other issues are waived. *See Young v. Sec'y of Health and Human Servs.*, 925 F.2d 146, 149 (6th Cir. 1990). Thus, for the sake of brevity, the factual background summarized herein will only include evidence related to his mental impairments.

food. (Tr. 243). Plaintiff would clean his room and did not need help or encouragement to do so. *Id.* He went outside approximately four times a week, traveled by walking, and did not drive because he did not have a car. (Tr. 244). Plaintiff shopped in corner stores, could count change, handle a savings account, and use a checkbook/money orders, but could not pay bills since he "[did not] work". *Id.* Plaintiff stated he did not spend time with others, but went to church sometimes and did not require anyone to accompany him. (Tr. 245). He estimated he could walk for approximately ten minutes before needing to stop and rest, was unsure of how long he could pay attention, could follow written instructions "most of the time", follow spoken instructions "kind of alright not to [sic] bad", was able to listen to authority figures, did not handle stress well, and handled changes in routine "kind of o.k.". (Tr. 246-47).

In August 2012, Plaintiff reported: "I'm hearing more voices I try not to listen to them. Its [sic] getting worse. It [sic] hard  to function in my mind. Pain in my back still hurt [sic] and still depressed bad". (Tr. 253).

On October 26, 2012, Plaintiff began mental health treatment at Northeast Ohio Neighborhood Health Services ("NEON"). (Tr. 334). He complained of depression symptoms since 2010. (Tr. 337). Charles Byrd, LISW-S ("Mr. Byrd"), conducted a mental status examination and noted Plaintiff showed signs of psychosis and depressed mood, but had an intact memory, average intelligence, fair reasoning, fair impulse control, fair judgment, fair insight, and no suicidal or homicidal ideation. (Tr. 339). Plaintiff was assigned a global assessment of functioning ("GAF") score of 46.[2] (Tr. 340). He returned to NEON a few weeks later for a follow-up

---

2. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32–33 (4th ed., Text Rev.2000). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed.

appointment. (Tr. 341). Plaintiff demonstrated anxious/fearful thoughts, depressed mood, and signs of psychosis but no signs of mania. (Tr. 341-42).

Plaintiff saw Michelle Romero, D.O., in November 2012. (Tr. 344). He complained of hearing voices, which told him to kill himself. *Id.* Dr. Romero noted an examination revealed a depressed mood, flat affect, distracted attention, hypoactive psychomotor behaviors, but no signs of mania, appropriate appearance, alertness, and oriented to time, place, person, and situation. (Tr. 346). She diagnosed Plaintiff with major depressive disorder (moderate), and ruled out depression with psychotic features and schizophrenia. (Tr. 347). Dr. Romero assigned Plaintiff a GAF score at 50.[3] *Id.*

Plaintiff saw Dr. Romero again in December 2012. (Tr. 349). Dr. Romero noted a mental status examination revealed the following: signs of psychosis, but no mania; appropriate appearance; oriented to person, place, time, and situation; poor eye contact; anxious mood; soft speech; constricted affect; intact memory; clear consciousness; average intellect; cooperative and discouraged attitude; distracted attention; fair reasoning; fair impulse control; fair judgment; fair insight; abasing self-perception; logical thought processes; and no expressed suicidal or homicidal ideation. (Tr. 350). She again assigned him a GAF score of 50.[4] *Id.*

In January 2013, Plaintiff returned to NEON for an appointment with Dr. Romero. (Tr. 355). A mental status examination revealed the following: signs of psychosis, but no signs of

_____

2013) ("DSM–V") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). However, as set forth in the DSM—IV, a GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)". *DSM-IV-TR* at 34.
3. *DSM-IV-TR*, *supra* note 2.
4. *DSM-IV-TR*, *supra* note 2.

mania; appropriate appearance; oriented to person, place, and time; vague behavior with no eye contact, but cooperative; hypoactive psychomotor behaviors; soft and monotone speech; constricted affect; depressed mood; intact memory; clear consciousness; average intellect; cooperative and discouraged attitude; distracted attention; fair reasoning; fair impulse control; fair judgment; fair insight; abasing self-perception; concrete thought processes; and no expressed suicidal or homicidal ideation. (Tr. 356). Dr. Romero assigned Plaintiff a GAF score of 55.[5] *Id.*

Plaintiff had an individual therapy session with Mr. Byrd at NEON in February 2013. (Tr. 358). He was not exhibiting signs of psychosis or mania. (Tr. 360). Mr. Byrd noted Plaintiff's "[r]elated symptoms [were] fairly controlled." (Tr. 358). Plaintiff was assigned a GAF score of 51.[6] *Id.*

In March 2013, at a medication management appointment, Dr. Romero noted Plaintiff was not compliant with his medication due to financial constraints. (Tr. 420-21). He exhibited signs of psychosis, but no signs of mania. (Tr. 421). Plaintiff was "offered [sic] hospitalization, but refused and [did] not meet criteria for involuntary hospitalization." (Tr. 422). Dr. Romero assessed him with schizophrenia and depression, and assigned a GAF score of 50.[7] (Tr. 421). She also "[e]ncouraged on-going counseling services." (Tr. 422).

Plaintiff had another appointment with Dr. Romero in April 2013, at which time he reported hearing voices. (Tr. 417). A mental status examination revealed: signs of psychosis, but no signs of mania; decreased appetite; appropriate appearance; oriented to person, place, time, and situation; agitated behavior; unremarkable psychomotor behaviors; soft speech; flat affect; anxious

---

5. A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.
6.  *DSM-IV-TR*, *supra* note 5.
7. *DSM-IV-TR*, *supra* note 2.

mood; intact memory; clear consciousness; average intellect; cooperative and discouraged attitude; distracted attention; fair reasoning; fair impulse control; fair judgement; poor insight; abasing self-perception; concrete thought processes; auditory hallucinations; paranoia and delusions; suicidal ideation in thoughts; and no homicidal ideation. (Tr. 418). Dr. Romero assigned a GAF score of 50[8] and adjusted his medications. (Tr. 419).

A few weeks later, Plaintiff had an individual therapy session with Mr. Byrd. (Tr. 411). Plaintiff reported sleeping better "since he got his medication". (Tr. 413). Plaintiff again received a GAF score of 50.[9] (Tr. 414). He returned to NEON in June 2013, for an individual therapy session with Mr. Byrd. (Tr. 407). He also saw Dr. Romero in June 2013, for a medication management visit. (Tr. 404). She noted he appeared calm, but made very little eye contact. *Id.* Plaintiff reported hearing voices, and sometimes missing doses of his medication. *Id.* Dr. Romero assigned Plaintiff a GAF score of 50,[10] continued medication for psychosis (Tr. 406), and noted it was Plaintiff's last appointment with her and that Mr. Byrd would "help him get established with another psychiatrist for continued medication management." (Tr. 404).

Plaintiff saw Mr. Byrd in July 2013, and reported he "continue[d] to feel that his [medications] are not doing a lot." (Tr. 402). Plaintiff reported he "had a good [fourth] of [J]uly and he celebrated with his child and grandchildern [sic]." *Id.* Mr. Byrd noted it would be awhile before Dr. Romero was replaced, but that he had medication refills "to help keep him stable until we got another person in." *Id.* Plaintiff received a GAF score of 51.[11] (Tr. 403). He had another

---

8. *DSM-IV-TR*, *supra* note 2.
9. *DSM-IV-TR*, *supra* note 2.
10. *DSM-IV-TR*, *supra* note 2.
11. *DSM-IV-TR*, *supra* note 5.

appointment with Mr. Byrd in August 2013, at which time the notes reveal there was "improvement of initial symptoms." (Tr. 396).

Plaintiff began mental health treatment at Murtis Taylor Human Services in August 2013. (Tr. 383). He reported feeling depressed daily and fearing "someone [would] 'get him' on the street or on the bus." (Tr. 387). Plaintiff was diagnosed with unspecified paranoid schizophrenia and he received a GAF score of 39.[12] (Tr. 390). The following month, Plaintiff's diagnosis was mood disorder (not otherwise specified). (Tr. 394). He was prescribed Prozac and Risperdal. *Id.*

Mary Harrison, advanced practice nurse, conducted a psychiatric evaluation in November 2013. (Tr. 381). She noted Plaintiff was: difficult to assess; "making grimaces that seem put on[]"; "rehearsed and disingenuous[]"; speaking in a "childlike dialect" that "[s]eem[ed] put on[]"; "[s]eemed purposely to underperform[]"; and "uncooperative". (Tr. 382). She was unable to "asses his judgement [sic] or insight because he is disingenuous" and "[s]trongly suspect[ed] malingering". *Id.* Ms. Harrison added: "I am very suspect of his having psychotic symptoms. His behavior is very dramatic, not typical of any [p]sychosis this clinician has ever seen and it is very inconsistent." *Id.* She concluded: "[h]e has been on a regimen of Prozac . . . and Risperdal [ ] for a while now and which [sic] suggests his former prescriber didn't believe he was suffering from [p]sychosis either." *Id.* Ms. Harrison added that it was "possible he suffers from a mood disorder" and she would "monitor [him] closely and attempt to glean any true symptoms over time." *Id.*

Plaintiff had a medication management appointment in December 2013. (Tr. 379). He was disheveled, with a strong odor, and made poor eye contact. *Id.* He demonstrated a labile affect,

---

12. A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .")." *Id.*

mumbled and soft speech, depressed mood, disorganized thoughts, and limited judgment and insight. *Id.* Plaintiff reported Risperdal had helped decrease visual hallucinations. *Id.* There were no medication changes because he felt his medication worked well. *Id.*

In February 2014, Plaintiff had another medication management appointment. (Tr. 441). It was noted that during the appointment "he starred [sic] at the floor [with] no eye contact, however when he came in to register for the appointment he made direct eye contact with the receptionist." *Id.* Plaintiff reported he continued to experience visual and auditory hallucinations. *Id.* Also, the treatment note states the "conversation was linear, and rational." *Id.*

The following month, Plaintiff had another medication management appointment. (Tr. 439). The notes from the visit state that his "behaviors do not exemplify usual psychiatric symptoms". *Id.* The treating source added "he is trying to seem more impaired than he is. Constantly looking out the door as if paranoid but it seems put on, when his looking is ignored, he stops". *Id.*

A treatment note in April 2014, states Plaintiff was confused as to how to take one of his medications, but the treating source added she was "[u]nsure if client is actually confused about this . . .". (Tr. 447).

Opinion Evidence

*State Agency Physicians*

On September 4, 2012, state agency reviewer, Karen Steiger, Ph.D., determined Plaintiff had severe impairments of schizophrenia and other psychotic disorders resulting in moderate limitation in the areas of: restriction of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace; but no repeated episodes of decompensation. (Tr. 69-70). In her RFC assessment, Dr. Steiger determined Plaintiff

would be: "limited to performing and concentratin [sic] on work that does not involve strict production schedules or quotas"; would "function best in settings that don't require him to work around many others"; "would require a job [without] public contact, and only limited superficial interactions with others including supervisors"; and "would perform best in a setting where routines were static and expectations are clearly defined." (Tr. 73-74). On March 18, 2013, a second state agency reviewer, Janet Souder, Psy.D., affirmed these findings. (Tr. 101-02, 105-07).

*Consultative Examiner*

On July 19, 2012, consultative examiner Melissa Korland, Ph.D., performed a psychological evaluation. (Tr. 320). Plaintiff was "very nicely groomed" and demonstrated adequate judgment and insight. (Tr. 323-25). Dr. Korland noted Plaintiff had poor eye contact, appeared "quite nervous", and mumbled to himself. (Tr. 323). Dr. Korland added Plaintiff: had average cognitive functioning; would be able to understand and apply instructions in the work-setting; had difficulty with focused attention due to his auditory hallucinations and would be likely to exhibit mild impairment in attention and concentration; may have difficulty conforming to social expectations and difficulties responding to supervision and coworkers; and had problems with auditory hallucinations in the past and therefore feared hostile or aggressive voices would be directive towards others. (Tr. 326). Dr. Korland expected Plaintiff would experience stress in a workplace situation. (Tr. 327). She diagnosed him with schizoaffective disorder and assigned him a GAF score of 51.[13] (Tr. 325). Dr. Korland recommended Plaintiff undergo mental health treatment. *Id.*

---

13. *DSM-IV-TR*, *supra* note 5.

*Dr. Romero's Opinion*

On March 19, 2013, Dr. Romero completed an "Assessment of Ability to do Work-Related Activities (Mental)". (Tr. 364-65). She determined Plaintiff had "marked"[14] impairments in the following categories: "Estimated degree of impairment of the claimant's ability to relate to other people"; "Estimated degree of restriction of daily activities, e.g.: ability to attend meetings (church, etc.), socialize with friends/neighbors, etc."; "Estimated degree of impairment of the claimant's ability to maintain concentration and attention for extended periods"; "Estimated degree of impairment of the claimant's ability to sustain a routine without special supervision[]"; "Estimated degree of impairment of the claimant's ability to perform activities within a schedule, maintain regular attendance, and be punctual[]"; "Understand, carry out and remember instructions"; "Respond appropriately to co-workers"; "Respond to customary work pressures"; "Respond appropriately to changes in the work setting"; "Perform complex, repetitive, or varied tasks"; and "Behave in an emotionally stable manner". *Id.*

Dr. Romero determined Plaintiff had "moderate"[15] impairment in the following categories: "Estimated degree of deterioration in personal habits of claimant"; "Respond appropriately to supervision"; "Use good judgment"; and "Perform simple task". *Id.* Dr. Romero noted: "In the long-term, his medication should improve his level of functioning, but he is not stable at the current time." (Tr. 365). She estimated Plaintiff's impairments would cause him to be absent from work "[m]ore than three times a month". *Id.* When prompted to list Plaintiff's diagnoses, Dr. Romero

---

14. "Marked" is defined on the form as: "Serious limitation, severely limits ability to function (i.e. on task 48% - 82% in an 8[-hour- work day)." (Tr. 364).
15. "Moderate" is defined as: "Significant limitation (i.e. on task 82% - 88% in an 8[-hour] work day). (Tr. 364).

wrote: "296.32 [with] [rule out] psychotic [features] [and] 298.9 [with] [rule out] paranoid schizophrenia". *Id.*

<u>Hearing Testimony</u>

At the administrative hearing on July 1, 2014, Plaintiff testified he experienced "a lot of back pain" which radiated into his leg and was worse on the left side. (Tr. 38, 47). Plaintiff stated the pain was exacerbated by sitting or being still for "a long time." (Tr. 47-48). He was prescribed Naproxyn for back pain and noted he had a pain management appointment the following week. (Tr. 50). Plaintiff stated he used a doctor-prescribed cane at the hearing and noted he had used it for approximately eight to ten months. (Tr. 48). He would become frustrated and "throw stuff around and break stuff" because he was no longer able to do things he used to do. (Tr. 38, 45-46).

Plaintiff stated he saw Dr. Romero approximately eight or nine times beginning in 2012. (Tr. 38). He sought additional mental health treatment thereafter from another provider after Dr. Ramiro left NEON. (Tr. 39-40). Plaintiff stated he took Prozac daily and Depakote, which did not help diminish the voices he heard. (Tr. 50). Plaintiff stated he was "always down" and his depression impacted his ability to work. (Tr. 42). He slept "[k]ind of all right[]" (Tr. 43), had difficulty concentrating (Tr. 44-45), and experienced paranoia (Tr. 46). Plaintiff first stated had no problems with his appetite, but then stated his daughter had to "make[] [him] eat most of the time." (Tr. 44). Plaintiff also testified he heard voices "talking in [his] head", but he "tr[ied] not to listen to them." (Tr. 40). The ALJ brought up a concern he had with a provider's treatment note stating she was suspicious of Plaintiff's alleged psychotic symptoms as they were "inconsistent" and "not typical". (Tr. 41) (citing Tr. 382). Plaintiff's counsel asked the ALJ to give this note "minimal to no weight" because it was "inconsistent with the other evidence of the record", including the opinions of the consultative examiner and treating physician. (Tr. 41-42).

Plaintiff stated he spent a typical day watching television, "try[ing] to sit on the porch", and "trying to do stuff" but would become frustrated. (Tr. 48-49). He would put on his headphones and isolate himself from others. *Id.* Plaintiff stated he was frequently unable to get out of bed. (Tr. 49). His brother visited him and another brother would "come to see [Plaintiff] and take [Plaintiff] with him." *Id.* Plaintiff cooked and prepared some simple meals, but would burn food because he would "constantly forget[] about it and stuff." (Tr. 49-50).

The ALJ then presented the VE the following hypothetical questions based on an individual with the same age, education, and vocational background as Plaintiff. The first hypothetical was as follows:

> For the first hypothetical . . . I would like you to assume that that person could perform medium work with limits. That person could only occasionally use ladders, ropes or scaffolds. That person is limited to frequent stooping or crawling. That person is limited to work that does not involve strict production schedules or quotas or demands for close extended focus. That person functions best in settings that do not require him to work around many others. He retains the ability to complete simple tasks in a nonpublic static setting. That person is limited to jobs that do not require public contact and that are limited to superficial interactions with supervisors and co-workers and that person would perform best in a setting where routines are static and expectations are clearly defined.

(Tr. 55-56). The VE determined the individual could not perform Plaintiff's past work, but could perform other work available in the national economy. (Tr. 56-58).

ALJ Decision

In a written decision dated September 26, 2014, the ALJ made the following findings of fact and conclusions of law:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through March 31, 2015.

2. [Plaintiff] has not engaged in substantial gainful activity since December 1, 2010, the alleged onset date.

3. [Plaintiff] has the following severe impairments: degenerative disc disease, schizophrenia, schizoaffective disorder, depressive type, and mood disorder.

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I finds that [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can occasionally climb ladders, ropes, and scaffolds. He can perform frequent stooping or crawling. He cannot perform work that involves strict production schedules, quotas, or demands for close and extended focus. He can complete simple tasks in a non-public and static setting, and where job expectations are clearly defined. He cannot have contact with the public. He can have superficial interactions with others including supervisors.

6. [Plaintiff] is unable to perform any past relevant work.

7. [Plaintiff] was born on September 6, 1965 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. [Plaintiff] has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Plaintiff] is "not disabled," whether or not [Plaintiff] has transferable job skills.

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from December 1, 2010, through the date of this decision.

(Tr. 15-25) (internal citations omitted).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for disability benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's RFC and can claimant perform past relevant work?

5.  Can claimant do any other work considering his RFC, age, education, and work experience?

14

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff's sole argument is that the ALJ erred by improperly evaluating the opinion of treating physician Dr. Romero. (Doc. 14, at 16-20). The Commissioner responds the ALJ appropriately evaluated the treating source opinion and provided "good reasons" for the weight he assigned it. (Doc. 16, at 7-9).

Treating Physician Rule

With regard to Dr. Romero's opinion, Plaintiff argues the ALJ erred by: (1) failing to address her opinion that Plaintiff would be absent from work more than three times a month; and (2) providing two insufficient "good reasons" for assigning the opinion less than controlling weight. (Doc.14, at 18-19).

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-

treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec*., 561 F.3d 646, 651 (6th Cir. 2009); *see also Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (holding ALJ adequately addressed opinion by indirectly attacking both its consistency and supportability with other record evidence).

16

Here, on March 19, 2013, Dr. Romero completed an "Assessment of Ability to do Work-Related Activities (Mental)". (Tr. 363-65). In response to the question, "What effect if any, does the claimant's medication have on his/her ability to function?", Dr. Romero responded: "In the long-term, his medication should improve his level of functioning, but he is not stable at the current time." (Tr. 365). She estimated Plaintiff's impairments would cause him to be absent from work "[m]ore than three times a month". *Id.* When prompted to "[s]tate the DSM-IV Diagnoses", Dr. Romero wrote: "296.32 [with] [rule out] psychotic [features] [and] 298.9 [with] [rule out] paranoid schizophrenia". *Id.*

When specifically addressing this opinion, the ALJ concluded:

> I give little weight to the opinion dated March 19, 2013 by Dr. Romero, a treating physician. The opinion is not entitled to controlling weight due to only giving rule out diagnoses, which indicates to me that a treating source relationship is not yet established. She noted many marked functional limitations, and those limitations are not consistent with the mental health treatment notes. She initially examined [Plaintiff] in November 2012 and rated his GAF at 50. By January and February 2013, she noted an improved GAF of 55 (Ex. 8F, pp. 24, 27). She reported that [Plaintiff's] mental health condition would improve with treatment, but he was not stable at that time.

(Tr. 23).

First, Plaintiff briefly argues the ALJ's failure to discuss Dr. Romero's opinion that Plaintiff would be absent from work more than three times a month is reversible error because the "[VE] opined that three or more absences per month was work preclusive" which was in turn "very harmful to [Plaintiff]". (Doc. 14, at 18). "It is well established that the hypothetical questions need only incorporate . . . those limitations which the ALJ has accepted as credible." *Infantado v. Astrue*, 263 F. App'x 469, 476-77 (6th Cir. 2008) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007)). Here, the ALJ did not incorporate this limitation into his hypothetical, but rather it was

17

posed by Plaintiff's counsel. (Tr. 59). Because the ALJ did not give controlling weight to the opinion and, for the reasons discussed below, provided "good reasons" for doing so, he was not required to adopt Dr. Romero's opinion Plaintiff would be absent from work more than three days a month. The ALJ's decision not to incorporate this limitation in the hypothetical questions was not in error. Furthermore, "an ALJ is not required to discuss every piece of medical opinion evidence", so long as enough is discussed to enable reviewing courts to determine whether substantial evidence supports the decision. *Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 753 (6th Cir. 2011). *See Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (internal citation omitted). Therefore, this argument is not well taken.

Second, Plaintiff argues the two reasons provided by the ALJ for discounting the opinion were not sufficient. The first reason being a treating source relationship had not yet been formed because Dr. Romero only provided "rule[-]out diagnoses". (Doc. 14, at 18). The Court agrees with Plaintiff that this does not appear to be correct. Dr. Romero listed code numbers of 296.32 and 298.9 which correspond to diagnoses of major depressive disorder and psychotic disorder (not otherwise specified), respectively. *DSM-IV-TR* at 343, 376. Following these numbers, she listed, by name, "rule-out diagnoses" of psychotic features and paranoid schizophrenia. (Tr. 365). Accordingly, the Court agrees this is not a "good reason" for discounting the opinion.

Plaintiff also argues the second reason provided for assigning less than controlling weight to the opinion, (the functional limitations provided by Dr. Romero were inconsistent with the mental health treatment notes), is an insufficient "good reason". (Doc. 14, at 19). Plaintiff alleges that not only are Dr. Romero's diagnoses supported by the treatment notes, but also that the sole

18

example of inconsistency, a slightly increased GAF score of 55 at one appointment, "ignore[s] the fact that Dr. Romero assigned GAF ratings at 50 or below at every other appointment before and after the exam cited by the ALJ." (Doc. 14, at 19). Even though GAF scores were eliminated in the Fifth Edition of the DSM-V, which was published in 2013, the Sixth Circuit has since explained that GAF scores still "may assist an ALJ in assessing a claimant's mental RFC." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016). In the Sixth Circuit, courts are directed to "take a case-by-case approach to the value of GAF scores." *Id.* at 836.

> Previously, we have refused to find that a low GAF score established that the ALJ's decision was not supported by substantial evidence where the ALJ had reason to doubt the credibility of the assigning source; the claimant had conflicting GAF scores; the GAF scores were not accompanied by a suggestion that the claimant could not perform any work; substantial evidence supported the conclusion that the claimant was not disabled; and the VE testified that an individual with the claimant's limitations could still perform a number of jobs. On the other hand, we have looked to consistency among low GAF scores to determine that an ALJ minimized the severity of a claimant's symptoms and failed to provide good reasons for assigning limited weight to a treating doctor's opinion. We have also looked to the inconsistency between one doctor's assigned GAF score and a different doctor's opinion as a proper basis for rejecting the latter doctor's opinion.

*Id.* (internal citations omitted).

However, GAF scores are not dispositive. *Long v. Astrue*, 2011 LEXIS 34023 (M.D. Tenn.). The Sixth Circuit noted, "the Commissioner has declined to endorse the [GAF] score for use in the Social Security and SSI disability programs . . . ". *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (internal quotations and citations omitted). Thus, ALJ's are not required to give credence to a GAF score. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 716 (6th Cir. 2013) ("[T]he ALJ was not required to credit the VE's testimony regarding an individual with a GAF score of 50 or below.").

Here, the ALJ did not err in assessing the GAF scores because he did in fact consider the various scores throughout his analysis. (Tr. 19-23). Furthermore, substantial evidence supports the ALJ's conclusion Plaintiff was not disabled, and at the hearing the VE testified that a hypothetical individual with Plaintiff's limitations could perform a number of jobs in the national economy. *Miller*, 811 F.3d at 836. Indeed, the ALJ noted Dr. Romero's "marked" functional limitations were not consistent with the mental health treatment notes. (Tr. 23).

Prior to his conclusion, the ALJ offered further discussion of Dr. Romero's treatmentnotes and additional mental health treatment notes from NEON. (Tr. 21). He explained: (1) Plaintiff's GAF score improved from 50 to 55 through the course of treatment; (2) there was a gap in treatment from March 2013 to August 2013; (3) Plaintiff was suspected of malingering by treating sources; (4) at one point Dr. Romero recommended hospitalization, but "the examination did not warrant an involuntary admission" (citing Tr. 422); and (5) notes showed he "did not display the usual psychiatric symptoms", "was trying to appear more impaired than he was", and was "exaggerating his symptoms" (citing Tr. 438-42). The ALJ concluded: "The record contains clear evidence that [Plaintiff] has consciously attempted to portray limitations that are not actually present in order to increase the chance of obtaining benefits." (Tr. 21).

The ALJ's finding is supported by substantial evidence. Plaintiff was frequently found to be polite, cooperative, well spoken, neatly dressed, and well groomed, with an intact memory, average intelligence, fair reasoning, fair impulse control, fair judgment, fair insight, no suicidal or homicidal ideation, appropriate appearance, alertness, clear conciseness, average intellect, logical thought processes, and was oriented to time, place, person, and situation. (Tr. 228, 339, 346, 350, 356, 418). The mental health treatment notes also found Plaintiff was suspected of malingering and exaggerating his symptoms. (Tr. 381,439, 441, 447). Plaintiff does not challenge the ALJ's

credibility determination, finding him not entirely credible. (Tr. 19). Thus, the ALJ's conclusion Dr. Romero's extreme functional limitations were inconsistent with the mental health treatment notes is supported by substantial evidence.

Overall, the ALJ's reasoning speaks to the factors of supportability of the opinion and the consistency of the opinion with the record as a whole. 20 C.F.R. § 404.1527(d)(2); *see also Nelson*, 195 F. App'x at 470 (holding ALJ adequately addressed opinion by indirectly attacking both its consistency and supportability with other record evidence). The ALJ's reasons are "supported by the evidence in the case record, and  . . . sufficiently specific to make clear to any subsequent reviewers the weight [he] gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5. The question on review is not whether substantial evidence could support another conclusion, but rather whether substantial evidence supports the conclusion reached by the ALJ. *Jones,* 336 F.3d at 477.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends the Court find the ALJ's decision supported by substantial evidence, and affirm the Commissioner's decision denying benefits.


        s/James R. Knepp, II
        United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).